# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHEN PROCTOR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-07-654-M |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS | ) | |
| OF THE COUNTY OF POTTAWATOMIE, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, POTTAWATOMIE COUNTY PUBLIC SAFETY CENTER TRUST, AND BRIEF IN SUPPORT

---

Chris J. Collins, OBA No. 1800
John L. Blodgett, OBA No. 18343
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105-1815
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-Mail:       cjc@czwglaw.com
              john@czwglaw.com

March 2, 2009

Attorneys   for Defendant Pottawatomie
County Public Safety Center Trust

## TABLE OF CONTENTS                                    Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MATERIAL FACTS AS TO WHICH NO SUBSTANTIAL
    CONTROVERSY EXISTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

PROPOSITION I:                    THE TRUST IS ENTITLED TO
                            SUMMARY JUDGMENT WITH
                            RESPECT TO PLAINTIFFS'
                            CONSTITUTIONAL CLAIMS . . . . . . . . . . . . . . 16

        A.    Former Executive Director Bottoms Was Not a
              "Final Decision Maker" for the Trust . . . . . . . . . . . . . . . . . . . 17

        B.    Plaintiffs Have Failed to Demonstrate That
              Any Policy of Former Executive Director
              Bottoms Was Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . 19

        C.    Plaintiffs Have Failed to Demonstrate That a Policy,
              Practice or Custom of the Trust Was
              Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

PROPOSITION II:                   PLAINTIFFS CANNOT MAINTAIN A
                            CLAIM FOR PUNITIVE DAMAGES
                            AGAINST THE TRUST . . . . . . . . . . . . . . . . . . 24

PROPOSITION III:                  THE CLAIMS ASSERTED BY
                            PLAINTIFFS ASHLEY, FOOTE,
                            AND PROCTOR MUST BE
                            DISMISSED PURSUANT TO 42
                            U.S.C. § 1997e BASED ON
                            THEIR FAILURE TO EXHAUST
                            THEIR ADMINISTRATIVE
                            REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

PROPOSITION IV:                   PLAINTIFFS' CLAIMS ARE TIME-BARRED
                                  PURSUANT   TO   THE   STATUTE   OF
                                  LIMITATIONS SET FORTH IN OKLA. STAT.
                                  TIT. 12, § 95(11) . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES:**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) . . . . . . . . . . . . . 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505,
　　91 L. Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bd. of County Comm'rs of Bryant County, Okla. v. Brown*,520 U.S. 397,
　　117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) . . . . . . . . . . . . . . . . . . . . . 16, 24

*Booth v. Churner*, 532 U.S. 731, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) . . . 25

*Caldwell v. Moore*, 968 F.2d 595 (6th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548,
　　91 L. Ed. 2d 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247,
　　101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915,
　　99 L. Ed. 2d 107 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Clark v. City of Draper*, 168 F.3d 1185 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . 16

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 15

*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526 (10th Cir. 1994) . . . . . . . . 15

*Dill v. City of Edmond*, 155 F.3d 1193 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . 17

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 21

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jantzen v. Hawkins*, 188 F.3d 1247 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . 16, 24

*Jasper v. Thalacker*, 999 F.2d 353 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 21

*Jernigan v. Stuchell,* 304 F.3d 1030 (10th Cir.  2002) . . . . . . . . . . . . . . . . . . . . 26

*Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910,166 L. Ed. 2d 798 (2007) . . . . . . 26

*Kikumura v. Osagie*, 461 F.3d 1269 (10th Cir. 2006) . . . . . . . . . . . . . . . . . 25, 26

*Malek v. Haun*, 26 F.3d 1013 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*McKee v. Heggy*, 703 F.2d 479 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 25

*Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . 21

*Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658,
        98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Norton v. City of Marietta*, 432 F.3d 1145 (10th Cir. 2005) . . . . . . . . . . . . . . . 26

*Presley v. Bd. of County Comm'rs of Oklahoma County*,
        1999 OK 45, 981 P.2d 309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Robbins v. Oklahoma,* 519 F.3d 1242 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . 25

*Sampley v. Ruettgers*, 704 F.2d 491 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . 21

*Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Whitley v. Albers,* 475 U.S. 312, 106 S. Ct. 1078,
        89 L. Ed. 2d 251 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Witzke v. Femal*, 376 F.3d 744 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) . . . . 26

## STATUTES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 17, 19, 24, 29
42 U.S.C. § 1997e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27, 30
Okla. Stat. tit 12, § 95(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30
Okla. Stat. tit. 60, §§ 176 to 180.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18, 19

## RULES

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 30

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT POTTAWATOMIE COUNTY PUBLIC SAFETY CENTER TRUST, AND BRIEF IN SUPPORT

Defendant, Pottawatomie County Public Safety Center Trust ("Trust"), moves for an Order pursuant to Rule 56(c) of the Federal Rules of Civil Procedure granting summary judgment in its favor.

## STATEMENT OF THE CASE

Pottawatomie County, like many counties in Oklahoma and throughout the United States, was plagued with problems concerning its antiquated jail. Many of the jails in Oklahoma were constructed decades ago and were usually located in the county courthouses. This was also true of the Pottawatomie County Jail ("County Jail"), which was located in the Pottawatomie County Courthouse.

In late 1999, the Oklahoma Jail Inspector issued a deadline to the Board of County Commissioners of Pottawatomie County ("Board") that it had to have an action plan to repair problems in the County Jail. The County Jail's problems included plumbing, mold, sanitary issues, over crowded living conditions for inmates and numerous other problems which resulted in the facility's failure to meet the Oklahoma Minimum Jail Standards.

The Board had previously tried to deal with the County Jail problems by proposing a sales tax, however, the sales tax was defeated in August of 1995. In July of 2000, the Board attempted to obtain additional funding for the County Jail by proposing another sales tax which, again, was defeated. In the summer of 2001, a

Pottawatomie County Jail Advisory Committee was established to research the County Jail's dilemma and propose changes.

In February of 2002, the Board unanimously approved a Trust Indenture which created the Trust. The Trust was set up pursuant to the provisions of Title 60 of the Oklahoma Statutes. This creation of the Trust resulted in a significant change in the manner in which the County Jail would be operated. Before the Trust, the County Jail was a traditional county jail, being operated by the County Sheriff, pursuant to the provisions of Title 19 of the Oklahoma Statutes. With the establishment of the Trust and as of October 15, 2002, the County Sheriff no longer had any direct involvement in the operation of the County Jail. Instead, Rodney Bottoms was hired by the Trust to serve as the Executive Director of the County Jail.

By March of 2002, the Trust was studying the costs associated with building a new detention facility. It was decided that a county sales tax would be needed to fund such a facility. Meanwhile, Don Garrison, the State Jail Inspector, gave the Board a May 1, 2002 deadline to move prisoners to the Shawnee City Jail, or begin renovations at the old County Jail facility.

By April 2002, Executive Director Bottoms proposed to the Trust that a new detention facility be constructed. That same month, the Pottawatomie County Sales Tax Committee endorsed a sales tax for the purpose of funding a new detention facility. In June of 2002, the Pottawatomie County voters passed a sales tax, which provided for funding a new detention facility. On October 15, 2002, pursuant to an

2

Operational Agreement between the Trust and the County Sheriff, the Trust became responsible for the management of the County Jail. In late 2002, the Trust approved an agreement with the City of Shawnee to lease the Shawnee Municipal Jail to assist in the overcrowding situation that was occurring at the County Jail. In January of 2003, the old Shawnee municipal jail was reopened to function as a booking and holding facility in conjunction with the old County Jail facility. In December 2003, ground was broken for a new detention facility and, on April 19, 2005, the Pottawatomie County Public Safety Center ("PCPSC") was approved for occupancy by the Oklahoma Jail Inspector. Executive Director Rodney Bottoms was given the responsibility of the operation of the PCPSC.

All of the Plaintiffs are former inmates of the PCPSC. Plaintiffs filed suit on May 17, 2007 in the District Court of Pottawatomie County, Oklahoma alleging that tortious acts purportedly occurred at the PCPSC in violation of their constitutional rights. Specifically, Plaintiffs' alleged PCPSC detention officers abused the use of restraints, restraint chairs, and tasers. On May 23, 2007, Plaintiffs' filed an Amended Petition in the District Court of Pottawatomie County, Oklahoma,[1] alleging the same acts asserted in their initial Petition violated their rights under the United

---

[1]On June 7, 2007, this matter was removed from the District Court of Pottawatomie County to the United States District Court for the Western District of Oklahoma [Dkt. #1]. Thus, Plaintiffs' initial pleadings were entitled "Petition," and "Amended Petition." In deference to the federal forum, Defendant will refer to the Petition and Amended Petition as one document, Plaintiffs' "Complaint."

States Constitution.[2]  Plaintiffs did not assert a state tort cause of action in their Complaint.

Plaintiffs, Stephen Proctor, Robert Almon, Travis Foote, Matthew Laney and Tecumseh Martinez allege that, on separate occasions during a time period of June 1, 2005 to July 10, 2005, while inmates of the PCPSC, they were each placed into restraint chairs without benefit of a hearing, medical supervision, routine bathroom breaks, and normal food and utensils, all of which they claim were in violation of their Fourth, Eighth, and Fourteenth amendment rights under the United States Constitution.  Plaintiffs, Matthew Laney, Tecumseh Martinez, Lloyd Conover and Kenneth Reinhart allege that on separate occasions during a time period of June 1, 2005 to June 24, 2005, while inmates of the PCPSC, they were each chained to their beds in violation of their First, Fourth, Eighth and Fourteenth amendment rights under the United States Constitution.   Plaintiffs, Bobby Ashley and Tecumseh Martinez allege that on or about May 19, 2005 and June 1, 2005, respectively, while

---

[2]Plaintiffs referenced the Oklahoma Constitution in their Complaint. If Plaintiffs are attempting to assert a claim based on the Oklahoma Constitution, such a claim is superfluous.  As a general rule, constitutional protections encompassed in Oklahoma's Constitution are coextensive with those of its federal counterpart. *Presley v. Bd. of County Comm'rs of Oklahoma County*, 1999 OK 45, 981 P.2d 309, 312. If Plaintiffs are attempting to assert a 42 U.S.C. § 1983 claim based on an alleged violation of the Oklahoma Constitution, the claim is insufficient to support a § 1983 cause of action.  *See, Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994) (the violation of a state's constitution does not support liability under 42 U.S.C. § 1983).

inmates of the PCPSC, they were tasered in violation of their Fourth, Eighth and Fourteenth amendment rights under the United States Constitution.[3]

Plaintiffs allege a pattern of abuse reflecting a policy which is in contravention of existing law and the Constitution of the United States, and that the Board and the Trust have ignored or failed to supervise the management of the PCPSC. Plaintiffs' claim these acts involved an extreme degree of risk to them and show deliberate indifference to existing law and their constitutional rights, entitling them to exemplary damages. Plaintiffs have not sued the individual jailer(s) who allegedly committed the unconstitutional acts.[4]

## MATERIAL FACTS AS TO WHICH NO
## SUBSTANTIAL CONTROVERSY EXISTS

1.      The Trust was created on February 4, 2002 pursuant to the provisions of Title 60 of the Oklahoma Statutes.  [*See,* Affidavit of Trustee Larry Briggs, ¶ 3, attached hereto as Ex. 1, and the PCPSC Trust Indenture ("Trust Indenture"), attached thereto as Ex. A.]  The Trust was created pursuant to the provisions of Okla. Stat. tit. 60, §§ 176 to 180.4, in part, for the purposes of promoting, developing, owning, leasing, and financing projects or facilities relating to corrections facilities,

---

[3]Plaintiff Amanda Ellette was among those Plaintiffs who joined in filing the instant action.  Plaintiff Ellette was dismissed pursuant to a Joint Stipulation of Dismissal Without Prejudice on February 23, 2009 [Dkt. # 28].

[4]Plaintiffs' Complaint named Rod Bottoms, individually as the Director of the PCPSC, as a defendant.  Defendants filed a Suggestion of Death Upon the Record [Dkt. #24] on October 23, 2008 and through its Order [Dkt. #27] of January 29, 2009, this Court dismissed Plaintiffs' claims against Rod Bottoms.  No other individual has been named as a defendant.

jails, or other facilities relating to the administration of justice. [Ex. 1, Briggs Aff., ¶ 4, and Trust Indenture, Ex. A thereto.]

2.     The Trust Indenture describes the powers and duties of the Trustees and states that the Trustees shall have the right, power, duty, authority and discretion to exercise exclusive management and control of the properties of the Trust estate.   [Ex. 1, Briggs Aff., ¶ 5, and Trust Indenture, Ex. A thereto.]

3.     The Trust Indenture grants the Trustees the authority to contract for services with firms or persons to carry out the purposes of the Trust. [Ex. 1, Briggs Aff., ¶ 6, and Trust Indenture, Ex. A thereto.]

4.     The Trust Indenture authorizes the Trustees to appoint a Chief Executive Officer ("CEO") and/or Executive Director for the Trust Estate, which, when created, shall undertake responsibilities assigned to them from time to time by the Trustees.  The said CEO shall administer the business of the Trust Estate as directed from time to time by the Trustees. The CEO may not be a Trustee.  [Ex. 1, Briggs Aff., ¶ 7, and Trust Indenture, Ex. A thereto.]

5.     In October, 2002, Rod Bottoms ("Bottoms") was hired by the Trust to serve as Executive Director of the new detention center.  [Ex. 1, Briggs Aff., ¶ 8, and Employment Agreement, Ex. B thereto.]

6.     Pursuant to a Detention Services Operational Agreement ("Operational Agreement") entered into between the Board, the Trust, and the County Sheriff, the Trust assumed responsibility for the management of the new detention center

effective October 15, 2002. [Ex. 1, Briggs Aff., ¶ 9, and Operational Agreement, Ex. C thereto.]

7.      The Operational Agreement specified that the Trust Director, an employee of the Trust, would be the manager of the new detention center.  Bottoms was the Trust Director.  [Ex. 1, Briggs Aff., ¶ 10, and Operational Agreement, Ex. C thereto.]

8.      Upon completion of the PCPSC, inmates were transferred from the old county jail and the municipal jail into the PCPSC.  [Ex. 1, Briggs Aff., ¶ 11.]

9.      The Trust operated, and continues to operate, the PCPSC pursuant to the terms of the Operational Agreement.  [Ex. 1, Briggs Aff., ¶ 12.]

10.     Upon the completion of the PCPSC, Rodney Bottoms became the Executive Director of the PCPSC. [Ex. 1, Briggs Aff., ¶ 13.]

11.     As Executive Director, Bottoms reported directly to the Trustees of the Trust.  [Ex. 1, Briggs Aff., ¶ 14.]

12.     Bottoms drafted Policies and Procedures for the PCPSC which he signed into effect on January 1, 2003. [See, Affidavit of Pottawatomie County Safety Center Public Trust Executive Director Sid Stell, ¶ 3, attached hereto as Ex. 2.]

13.     Policy 4-1 states detention personnel shall use the lowest level of force necessary under the circumstances to properly perform their duties. [Ex. 2, Stell Aff., ¶ 4, and Policy 4-1, attached thereto as Ex. A.]

14.     Policy 10-7-10 permits the use of force on inmates only when necessary.  The policy provides:

> Use of physical force is restricted in the Detention Center to instances of self-defense, protection of others, protection of property, and prevention of escapes.  All Detention Center staff complies with Policies that deal with the Use of Force, and Reporting Use of Excessive Force.
>
> Restraints are used only as a precaution against escape during transport and as prevention against inmate self-injury, injury to others, or damage to property.  Use of restraints for other than transportation is approved as specified [regarding each type of restraint listed].
>
> Uses of physical force or restraints are not used as punishment, nor does any staff member keep restraints on any inmate longer than the amount of time absolutely necessary.  Restraints are applied only with the approval of the facility administrator or shift supervisor.

[Ex. 2, Stell Aff., ¶ 2, and Policy 10-7-10, attached thereto as Ex. B.]

15.     Policy 10-7-10 also lists specific types of restraint devices which may be used only when necessary, including handcuffs, leg irons, flex cuffs, belly chains, restraint belts and four-point restraints.   Other than when an inmate is being transported, the use of these restraints must be approved by the shift supervisor, "unless there is an immediate and urgent need to restrain a person who is uncontrollably violent to self, others, or property.  In this event, an officer may decide when to apply restraints, and must report this to his supervisor as soon as the situation has stabilized."  [Ex. 2, Stell Aff., ¶ 6, and Policy 10-7-10, attached thereto as Ex. B.]

8

16.     Policy 10-7-10 lists further types of restraints which may be used for medical and psychiatric purposes only; however, the use of these restraints requires notification and/or approval of the facility physician, and strict guidelines (such as regular face-to-face evaluation by a physician or psychiatrist) must be followed. [Ex. 2, Stell Aff., ¶ 7, and Policy 10-7-10, attached thereto as Ex. B.]

17.     At the time of Plaintiffs' incarceration in the PCPSC, the Trust did not have any policies of its own regarding the use of restraint chairs.  [Ex. 1, Briggs Aff., ¶ 15.]

18.     At the time of Plaintiffs' incarceration in the PCPSC, the Trust did not have any policies of its own regarding the use of chains to restrain inmates in their cells.  [Ex. 1, Briggs Aff., ¶ 16.]

19.     At the time of Plaintiffs' incarceration in the PCPSC, the Trust did not have any policies of its own regarding the use of tasers.  [Ex. 1, Briggs Aff., ¶ 17.]

20.     Plaintiff Bobby Ashley knows of no policy or procedure of the PCPSC regarding the use of tasers in the facility. [*See,* Bobby Ashley Deposition, 111:6-10, 114:10-17, attached hereto as Ex. 3.]

21.     Plaintiff Ashley is not aware of any factual information that it was the policy or practice of the Trust to use tasers to maliciously cause inmates harm. Plaintiff Ashley is also not aware of any factual information that the Trust endorsed or approved the use of tasers to deliberately cause harm to inmates. [Ex. 3, Ashley Dep., 115:11-116:5.]

9

22.     Plaintiff Ashley had no factual reason to believe any members of the Trust or the Board knew or approved of his allegedly being tasered.  [Ex. 3, Ashley Dep., 113:25-116:5.]

23.     Plaintiff Robert Almon has no knowledge of any policies written, endorsed, or adopted by the Trust regarding the use of restraint chairs.  Plaintiff Almon has no knowledge that the Trust even knew of the use of a restraint chair. [*See,* Robert Almon Deposition, 109:9-19, attached hereto as Ex. 4.]

24.     Plaintiff Almon has no factual information that it was the policy, practice or custom of the Trust to use restraint chairs to maliciously and sadistically cause harm to inmates.    [Ex. 4, Almon Dep., 110:1-7.]

25.     Plaintiff Kenneth Reinhart was not aware of any PCPSC policy regarding restraint chairs or chaining inmates to their bunks. [*See,* Kenneth Reinhart Deposition, 141:8-16, 141:23-142:3, attached hereto as Ex. 5.]

26.     Plaintiff Reinhart does not believe any of the Trustees from the Trust were personally involved in the incidents relating to him.  [Ex. 5, Reinhart Dep., 144:18-146:7.]  Plaintiff Reinhart has no knowledge that the Trust knew he was purportedly chained to his bed or restrained.  [Ex. 5, Reinhart Dep., 151:13-24.]

27.     Plaintiff Reinhart does not have any knowledge or factual information that the Trust knew what was purportedly occurring regarding the use of restraints. [Ex. 5, Reinhart Dep., 154:2-14.]

28.     Plaintiff Reinhart is not aware of any factual information and has no personal knowledge that it was the policy, custom or practice of the Trust to instruct, endorse or approve the use of restraint chairs to maliciously and sadistically cause harm to inmates.  [Ex. 5, Reinhart Dep., 154:15-21.]

29.     Plaintiff Lloyd Conover has no knowledge of any written policies of the Trust regarding chaining inmates to their bunks.  [*See,* Lloyd Conover Deposition, 117:18-118:7, attached hereto as Ex. 6.]

30.     Plaintiff Conover has no knowledge that anyone at the Trust participated in, had knowledge of, or had any formal or written policy regarding chaining him to his bunk.  [Ex. 6, Conover Dep., 122:10-16, 122:17-123:12.]

31.     Plaintiff Tecumseh Martinez has no information that the Trust approved of or had a policy regarding the use of restraint chairs.  [*See,* Tecumseh Martinez Deposition, 161:23-162:5, attached hereto as Ex.7.]   Plaintiff Martinez has no knowledge that the Trust even knew he was ever placed in a restraint chair.  [Ex. 7, Martinez Dep., 162:6-10.]

32.     Plaintiff Martinez has no knowledge of any policies of the Trust regarding the use of a restraint chair.  Martinez has no knowledge that the Trust directed or encouraged the use of a restraint chair.  [Ex. 7, Martinez Dep., 162:24-163:4.]

33.     Plaintiff Martinez has no knowledge or factual information that the Trust used the restraint chair as a means to cause deliberate harm to inmates.  [Ex. 7, Martinez Dep., 162:11-23.]

34.     Plaintiff Travis Foote has no factual information or knowledge about any policy of the Trust concerning restraint chairs.  [*See,* Travis Foote Deposition, 169:25-170:6, 171:7-10, attached hereto as Ex. 8.]

35.     Plaintiff Stephen Proctor does not know of any Trust policy regarding use of restraint chairs or restraint devices of any type.  [*See,* Stephen Proctor Deposition, 192:24-193:15, 196:22-197:11, 197:15-20, attached hereto as Ex. 9.]

36.     Plaintiff Proctor was not aware of any factual information that it was the policy of the Trust to use restraint chairs to maliciously or sadistically harm inmates. [Ex. 9, Proctor Dep., 198:2-7.]

37.     Plaintiff Matthew Laney does not know of any policies adopted or endorsed by the Trust regarding the use of restraint chairs.   Laney has no knowledge that the Trustees of the Trust knew that he had been placed into a restraint chair. [*See,* Matthew Laney Deposition, 75:1-76:11, attached hereto as Ex. 10.]

38.     The Trustees of the Trust were not personally involved in the incidents at issue in the instant action, or in any related events. [Ex. 1, Briggs Aff., ¶ 18.]

39.     To exhaust his administrative remedies, a PCPSC prisoner is required to file a grievance as well as a grievance appeal. [Ex. 2, Sid Stell Aff., ¶¶ 9-11, and Inmate Handbook, p. 18, attached thereto as Ex. C.]

40.     Plaintiff Ashley stated that he was aware of the facility's grievance procedures and that he had, in fact, previously filed grievances unrelated to the instant action.  [Ex. 3, Ashley Dep., 95:4-10.]

41.     Plaintiff Ashley confirmed that, although he may have informed staff of his issues in some other manner, he did not file an actual grievance pursuant to the facility's policy regarding the tasing incident alleged in Plaintiffs' Complaint. [Ex. 3, Ashley Dep., 95:11-96:2.]

42.     Plaintiff Ashley was an incarcerated prisoner on May 17, 2007, the date this lawsuit was initiated. [*See*, Oklahoma Department of Corrections Offender Data, attached hereto as Ex. 11.]

43.     Plaintiff Foote testified he was aware of the grievance procedure at the Safety Center. [Ex. 8, Travis Foote Dep., 155:5-7.]  In fact, Plaintiff Foote had previously filed grievances unrelated to the instant action.  [Ex. 8, Travis Foote Dep., 150:4-155:4.]

44.     Foote never submitted a grievance about being placed in a restraint chair or being chained while incarcerated in the PCPSC. [Ex. 8, Travis Foote Dep., 150:4-22, 155:8-19.]

45.     Foote was an incarcerated prisoner on May 17, 2007, the date this lawsuit was initiated. [Ex. 11, Oklahoma Department of Corrections Offender Data.]

46.     Plaintiff Proctor had filed a grievance in the past, but he failed to file a written grievance regarding the alleged use of a restraint chair on him. [Ex. 9, Proctor Dep., 201:23- 202:7.]

47.     Even though Proctor knew there was a grievance procedure, he did not request grievance forms regarding the alleged use of a restraint chair, being restrained in his cell, or not being served normal food or utensils.  [Ex. 9, Proctor Dep., 203:5-15.]

48.     Proctor was an incarcerated prisoner on May 17, 2007, the date this lawsuit was initiated. [Ex. 11, Oklahoma Department of Corrections Offender Data.]

## ARGUMENT AND AUTHORITIES

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), the Supreme Court held that, "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The court further held that, "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The *Anderson* court stated that, "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of the plaintiff's position. *See, Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (*citing Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "[e]ven though all doubts must be resolved in [the nonmovant's] favor, allegations alone will not defeat summary judgment." *Cone*, at 530 (*citing Celotex*, 477 U.S. at 324). *See also, Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Additionally, "[i]n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

**PROPOSITION I:**       **THE TRUST IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' CONSTITUTIONAL CLAIMS.**

Plaintiffs allege the Trust violated their constitutional rights based on acts allegedly performed by jail employees from May 19, 2005 to July 10, 2005. However, liability under 42 U.S.C. § 1983 cannot be based upon the doctrine of *respondeat superior* or vicarious liability. *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

In *Monell*, the Supreme Court held that a governmental entity is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Monell*, at 694-95.  The actions of the governmental entity must be the moving force behind the constitutional violation. *Monell*, at 694.  Likewise, in *Jantzen v. Hawkins*, 188 F.3d 1247, 1259 (10th Cir. 1999), the Tenth Circuit specifically held that a governmental entity may not be held liable for violating § 1983 absent a showing that the alleged wrongdoer was executing an unconstitutional policy or custom *of the governmental entity itself (citing Monell*, 436 U.S. at 694 (1978) (emphasis added); *Clark v. City of Draper*, 168 F.3d 1185, 1187 n.5 (10th Cir. 1999)).  A municipality may not be held liable simply because it "employs a tortfeasor." *Bd. of County Comm'rs of Bryant County, Okla. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (*citing Monell*).  Additionally, "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal

culpability and causation." *Id.* at 406-07. Not only must Plaintiffs establish the existence of an unconstitutional policy or custom of the Trust, but they must also establish that this policy or custom *caused* the unconstitutional deprivations alleged. *Monell* at 694.

## A.   Former Executive Director Bottoms Was Not a "Final Decision Maker" for the Trust.

It is only when execution of a governmental policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts an injury that a political subdivision such as the Trust is responsible under § 1983. *Monell*, at 694. *See also, City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (holding municipality is liable for the actions of its employee only if the action is pursuant to a municipal custom or policy or is that of a final policymaker). The determination of who is the final policymaker of a municipality or county is a question of state law and is to be determined by the court. *Praprotnik*, at 124. The Supreme Court explained in *Praprotnik* that:

> [S]tate law . . . will *always* direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.

*Praprotnik*, at 125 (emphasis in original). *See also, Dill v. City of Edmond*, 155 F.3d 1193, 1210 (10th Cir. 1998) (holding question of whether public official is the municipality's final policymaker must be established by the plaintiff as a matter of state law).

Okla. Stat. tit 60 § 176.1, states, in pertinent part:

> D. [T]he affairs of the public trust shall be separate and independent from the affairs of the beneficiary in all matters or activities authorized by the written instrument creating such public trust including, but not limited to, the public trust's budget, expenditures, revenues and *general operation and management of its facilities or functions*; . . . .

Okla. Stat. tit. 60, § 176.1 (emphasis added).  In looking to the "written instrument creating such public trust," it is clear that the trust had complete control and oversight of the PCPSC.  The Trust was created on February 4, 2002 pursuant to the provisions of Title 60 of the Oklahoma Statutes, in part, for the purposes of promoting, administering, developing, owning, leasing, and financing projects or facilities relating to corrections facilities, jails, or other facilities relating to the administration of justice.  [Undisputed Fact No. 1.]  The Trust Indenture establishes that the Trustees maintain and exercise exclusive management and control of the properties of the Trust estate.  [Undisputed Fact No. 2.]  The Trust Indenture grants the Trustees the authority to contract for services with firms or persons to carry out the purposes of the Trust.  [Undisputed Fact No. 3.]  The Trust Indenture authorizes the Trustees to appoint a CEO and/or Executive Director for the Trust Estate, which, when created, shall undertake responsibilities assigned to them from time to time by the Trustees.  The said CEO shall administer the business of the Trust Estate as directed from time to time by the Trustees.  [Undisputed Fact No. 4.]  Bottoms was hired by the Trust to serve as Executive Director of the new detention center in

October, 2002, and subsequently became the Executive Director of the PCPSC. [Undisputed Fact Nos. 5 & 10.]  Pursuant to the Operational Agreement, the Trust assumed responsibility for management of the new detention center effective October 15, 2002. [Undisputed Fact No. 6.]  The Operational Agreement specified that the Trust Director, an employee of the Trust, would be manager of the new detention center.  Bottoms was the Trust Director.  [Undisputed Fact No. 7.]  Upon it's completion, the Trust operated, and continues to operate, the PCPSC pursuant to the terms of the Operational Agreement.   [Undisputed Fact No. 9.]  Bottoms reported directly to the Trustees of the Trust.  [Undisputed Fact No. 11.]

Thus, under the provisions of Title 60 and the Trust Indenture, it is clear that only the Trustees of the Trust possess final policy-making authority.  As a result, the final policymaker for the PCPSC is clearly the Trust.

### B. Plaintiffs Have Failed to Demonstrate That Any Policy of Former Executive Director Bottoms Was Unconstitutional.

Assuming Plaintiffs could establish that former Executive Director Bottoms was a final policymaker for the purpose of a § 1983 action, Plaintiffs cannot establish that his adopted policies and procedures were unconstitutional.  Former Executive Director Bottoms drafted policies and procedures for the PCPSC which were signed into effect on January 1, 2003.  [Uncontroverted Fact No. 12.]  Among those policies were policies authorizing the use of force in certain limited situations. [Uncontroverted Fact Nos. 13 & 14.]  However, the existence of these policies did

not violate inmates' rights.  The policy permitted the use of force on inmates only when  necessary.  [Uncontroverted Fact No. 14.]  The use of force was "restricted in the Detention Center to instances of self-defense, protection of others, protection of property, and prevention of escapes."  [Uncontroverted Fact No. 14.]  The policy explained that restraints were used "only as a precaution against escape during transport and as prevention against inmate self-injury, injury to others, or damage to property."  [*Id.*]  The policy went on to describe the specific types of restraint devices which may be used.  [Uncontroverted Fact No. 15.]  Furthermore, as the policy provided, "physical force or restraints [were] not used as punishment, nor [did] any staff member keep restraints on any inmate longer than the amount of time absolutely necessary."  [Uncontroverted Fact No. 14.]  Thus, the policy expressly permitted only the amount of force necessary to uphold the safety and security of the facility and did not authorize the use of excessive force in any manner.[5]

The use of force is not a violation of the Eighth Amendment if it is "applied in a good faith effort to maintain or restore discipline," as opposed to being applied "maliciously or sadistically for the very purpose of causing harm."  *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986).  "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree

---

[5]Plaintiffs did not sue the individuals who purportedly did not follow these policies.

of intentional force. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sampley v. Ruettgers*, 704 F.2d 491, 494 (10th Cir. 1983).   Plaintiffs have no evidence that restraints were applied or that tasers were used maliciously or sadistically for the very purpose of causing harm. [Undisputed Fact Nos. 21, 24, 28, 33 & 36.]

Additionally, although Bottom's policy at the PCPSC did not explicitly authorize the use of tasers, federal courts have held that the use of a taser or similar stun gun is not *per se* unconstitutional when used to compel obedience by inmates. *See, Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that the use of a taser gun against a "hostile, belligerent, and uncooperative" arrestee in order to effectuate the arrest was not excessive force in the totality of the circumstances); *Jasper v. Thalacker*, 999 F.2d 353, 354 (8th Cir. 1993) (using stun gun to subdue an unruly inmate not unconstitutional where plaintiff failed to prove that the officers used the stun gun "sadistically or maliciously" to cause harm); *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir.1992) (use of stun gun against disruptive prisoner to restore discipline and order does not violate Eighth Amendment); *Michenfelder v. Sumner*, 860 F.2d 328, 335-36 (9th Cir.1988) (policy of allowing use of taser guns on inmate who refuses to submit to a strip search did not constitute cruel and unusual punishment); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (upholding as constitutional the use of "mace, tear gas, or other chemical agents" to restore

discipline). Courts "should . . . be extremely cautious before attempting to prohibit or limit the necessary means" prison officials use to carry out their responsibilities. [*Id.*]

Former Executor Director Bottoms' policy which permitted the use of specified restraints only when absolutely necessary was a policy that only allowed force to be "applied in a good faith effort to maintain or restore discipline," as opposed to being applied "maliciously or sadistically for the very purpose of causing harm." *See, Whitley*, 475 U.S. at 320-21.   The policy permitted only the degree of force necessary and only for the necessary length of time.  [Uncontroverted Fact No. 14.] Therefore, the policy was constitutional and, furthermore, as asserted above, Plaintiffs must prove that a policy of the Trust caused an actual violation of their constitutional rights which they have wholly failed to do.

### C.   Plaintiffs Have Failed to Demonstrate That a Policy, Practice or Custom of the Trust Was Unconstitutional.

Assuming, *arguendo*, by taking the factual allegations of Plaintiffs' Complaint as true, Plaintiffs could not support a cause of action against the Trust.  Plaintiffs may have alleged that individual detention officers violated their rights, but they have failed to link the Trust or its policies, practices or customs to any of the events they allege occurred at the PCPSC.  In fact,  Plaintiffs can provide no evidence that the Trust even knew that tasers, restraint chairs, or restraints were being used in the PCPSC, as alleged in the Complaint.  [Uncontroverted Fact Nos. 22, 23, 26, 30, 31

& 37.]  As previously stated, a governmental entity is not liable simply because it employs a tortfeasor.

At the time Plaintiffs were incarcerated in the PCPSC, the Trust itself had no policies which caused an alleged violation of Plaintiffs' rights.  The Trust had no policy regarding the use of restraint chairs.  [Uncontroverted Fact No. 17.]  The Trust had no policy regarding the use of tasers on inmates or the use of chains to restrain inmates in their cells.  [Uncontroverted Fact Nos. 18 & 19.]  The Trustees of the Trust were not personally involved in the incidents at issue in the instant action, or in any related events.  [Uncontroverted Fact No. 38.]

Likewise, Plaintiffs have no evidence that the violations alleged in the Complaint are related to a policy of the Trust.  Plaintiffs testified they had no knowledge of any policy belonging to the Trust endorsing or supporting the use of restraint chairs.  [Uncontroverted Fact Nos. 23, 25, 31, 32, 34, 35 & 37.]  Plaintiffs testified they had no knowledge the Trustees even knew of the use of restraint chairs.  [Uncontroverted Fact Nos. 23, 27, 31 & 37.]  Plaintiffs have no knowledge the Trustees had a policy of utilizing restraint chairs to deliberately cause harm to inmates.  [Uncontroverted Fact Nos. 24, 28, 33 & 36.]

Plaintiffs testified they had no knowledge of any policy belonging to the Trust endorsing or supporting the use of chains to restrain inmates.  [Uncontroverted Fact Nos. 25, 29, 30 & 35.]  They testified they had no knowledge the Trustees even knew of the use of chains to restrain inmates.  [Uncontroverted Fact Nos. 26 &30.]

23

Plaintiff Ashley testified that he had no knowledge of a policy belonging to the Trust endorsing or supporting the use of tasers. [Uncontroverted Fact No. 20.] He testified that he had no knowledge the Trustees even knew of the use of tasers. [Uncontroverted Fact No. 22.] He has no knowledge the Trustees had policies for the purpose of maliciously causing harm to inmates. [Uncontroverted Fact No. 21.]

As previously stated, a governmental entity may not be held liable absent a showing that the employee in question who allegedly violated § 1983 was executing an unconstitutional policy or custom *of the entity itself. Jantzen*, at 1259. Even assuming Plaintiffs could prove the incidents which they allege violated § 1983, they still have failed to demonstrate that an official policy or established custom *of the Trust* resulted in the alleged violation of their constitutional rights. Merely alleging that an individual jailer violated their rights is insufficient to demonstrate liability on the Trust. *See, Bd. of County Comm'rs of Bryant County*, at 403. Plaintiffs have presented no evidence to support their § 1983 claims against the Trust and the Trust is entitled to judgment as a matter of law.

**PROPOSITION II:**     **PLAINTIFFS CANNOT MAINTAIN A CLAIM FOR PUNITIVE DAMAGES AGAINST THE TRUST.**

Plaintiffs assert a claim for exemplary or punitive damages in their Complaint. However, Plaintiffs cannot maintain such a claim against the Trust. The United States Supreme Court has unequivocally stated that a municipality or political subdivision is immune from punitive damages under 42 U.S.C. § 1983. *City of*

24

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2748, 69 L. Ed. 2d 616

(1981); *see also, McKee v. Heggy*, 703 F.2d 479, 483 (10th Cir. 1983).

**PROPOSITION III:**    **THE CLAIMS ASSERTED BY PLAINTIFFS ASHLEY, FOOTE, AND PROCTOR MUST BE DISMISSED PURSUANT TO 42 U.S.C. § 1997e BASED ON THEIR FAILURE TO EXHAUST THEIR ADMINISTRATIVE REMEDIES.**

Plaintiff Ashley alleges that he was tasered eight times on May 19, 2005. He

further alleges he was chained to a bench on that date after he cursed at Sergeant

Manson, an employee of the PCPSC. Plaintiff Foote alleges that he was placed in

a restraint chair on July 1, 2005. Plaintiff Proctor alleges that he was placed in a

restraint chair beginning June 3, 2005. Plaintiffs Ashley, Foote, and Proctor all were

inmates on May 17, 2007, the date they initiated this lawsuit. [Uncontroverted Fact

Nos. 42, 45 & 48.] Because these Plaintiffs failed to exhaust their administrative

remedies for the claims they have asserted, Defendants are entitled to dismissal of

their claims pursuant to 42 U.S.C. § 1997e.

According to 42 U.S.C. § 1997e(a), a prisoner is required to exhaust his

administrative remedies for each claim he asserts prior to filing a lawsuit. *See,*

*Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).

The exhaustion requirement applies to all inmate suits relating to jail or prison life,

whether they involve general circumstances or particular episodes, and whether they

allege excessive force or some other wrong. *Kikumura v. Osagie*, 461 F.3d 1269,

1281 (10th Cir. 2006) (quotation omitted), *abrogated on other grounds by Robbins*

*v. Oklahoma,* 519 F.3d 1242, 1246-47 (10th Cir. 2008). No unexhausted claim may be considered in court. *Jones v. Bock*, 549 U.S. 199, 219-220, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007). *See also, Woodford v. Ngo*, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) (exhaustion is not left to the discretion of the district court but is mandatory).

Furthermore, a prisoner must exhaust each step of a prison or jail system's grievance procedure in full compliance with that facility's procedural requirements. *See, Jones,* at 218; *see also, Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002). The exhaustion must occur prior to the prisoner's bringing a lawsuit on those claims. *Jernigan* at 1032. The prison's procedural requirements themselves – not the Prison Litigation Reform Act – determine whether a grievance or grievance paperwork was properly submitted. *Jones*, 549 U .S. at 218. As the Tenth Circuit has determined, any claim which was not properly exhausted in full compliance with the grievance process and is procedurally barred should be dismissed with prejudice. *See, Kikumura*, at 1290. It is the plaintiff's status at the time he files suit that determines whether 42 U.S.C. § 1997e's exhaustion requirement applies. *See, Norton v. City of Marietta*, 432 F.3d 1145, 1150 (10th Cir. 2005). *See also, Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004) (plaintiff who had been released on probation, then had probation revoked and was reincarcerated prior to time he filed lawsuit was prisoner subject to exhaustion requirement).

To exhaust his administrative remedies, a PCPSC prisoner is required to file a grievance and a grievance appeal. [Uncontroverted Fact No. 39.] Plaintiff Ashley knew of the grievance procedure and had, in fact, filed grievances in the past. [Uncontroverted Fact No. 40.] Ashley conceded that he did not file a grievance relating to the alleged tasering of him. [Uncontroverted Fact No. 41.] Ashley was an incarcerated prisoner on the date this lawsuit was initiated. [Uncontroverted Fact No. 42.] Plaintiff Foote knew of the grievance procedure and had, in fact, filed grievances in the past. [Uncontroverted Fact No. 43.] Foote conceded that he did not file a grievance in any way relating to the use of restraint chair or other restraints on him. [Uncontroverted Fact No. 44.] Foote was an incarcerated prisoner on the date this lawsuit was initiated. [Uncontroverted Fact No. 45.] Plaintiff Proctor knew of the grievance procedure and had, in fact, filed a grievance in the past. [Uncontroverted Fact Nos. 46 & 47.] Proctor conceded that he did not file a grievance in any way relating to his allegations regarding the use of a restraint chair on him, his being restrained in his cell, or his not being served normal food or utensils. [Uncontroverted Fact No. 47.] Proctor was an incarcerated prisoner on the date this lawsuit was initiated. [Uncontroverted Fact No. 48.] Because of Plaintiffs Ashley, Foote, and Proctor's failure to exhaust their administrative remedies for the claims they have asserted, their claims must be dismissed pursuant to 42 U.S.C. § 1997e.

**PROPOSITION IV:**     **PLAINTIFFS' CLAIMS ARE TIME-BARRED PURSUANT TO THE STATUTE OF LIMITATIONS SET FORTH IN OKLA. STAT. TIT. 12, § 95(11).**

As Plaintiffs have alleged, the incidents asserted in their Complaint occurred in the PCPSC in 2005 when they were inmates of that facility. [Notice of Removal, and Am. Pet., Ex. 5 thereto, Dkt. #1.] Based on Oklahoma law, Plaintiffs' claims are barred by the statute of limitations for claims based upon events which occurred in a prison or jail. In Oklahoma, a plaintiff has one year from the date of the alleged injury to file a claim based upon facts which occurred while the person was an inmate. According to Okla. Stat. tit 12, § 95(11),

> All actions filed by an inmate or by a person based upon facts that occurred while the person was an inmate in the custody of one of the following:
>     a.     the State of Oklahoma,
>     b.     a contractor of the State of Oklahoma, or
>     c.     a political subdivision of the State of Oklahoma, to include, but not be limited to, the revocation of earned credits and claims for injury to the rights of another, shall be commenced within one (1) year after the cause of action shall have accrued[.]

Okla. Stat. tit. 12, § 95(11).

Plaintiff Almon alleges Defendants violated his rights on July 10, 2005, and his cause of action would have accrued on that date. [Notice of Removal, and Am. Pet., Ex. 5 thereto, Dkt. #1.] Plaintiff Ashley alleges Defendants violated his rights on May 19, 2005. [*Id.*] Plaintiff Conover alleges Defendants violated his rights in June of 2005. [*Id.*] Plaintiff Foote alleges Defendants violated his rights on July 1, 2005. [*Id.*] Plaintiff Laney alleges Defendants violated his rights on June 1, 2005. [*Id.*]

Plaintiff Martinez alleges Defendants violated his rights on June 1, 2005. [*Id.*] Plaintiff Proctor alleges Defendants violated his rights on June 3, 2005. [*Id.*] Plaintiff Reinhart alleges Defendants violated his rights on approximately June 24, 2005. [*Id.*]

The latest date on which any cause of action accrued in this case was July 10, 2005, and the latest date any of the Plaintiffs could have filed a lawsuit based on these claims would have been July 10, 2006. However, Plaintiffs failed to initiate their lawsuit until May 17, 2007, when they filed their Petition in state court. [Notice of Removal, and Pet., Ex. 8 thereto, Dkt. #1.] Because Plaintiffs failed to assert any of their claims within one year from the time the cause of action accrued, all of their claims are time-barred and must be dismissed.

## CONCLUSION

Defendant Pottawatomie County Public Safety Center Trust is entitled to summary judgment as a matter of law. Plaintiffs have failed to demonstrate that the Trustees had any knowledge of the incidents alleged in the Complaint, and the Trust may not be held liable simply because it employs a tortfeasor. The Trust can only be held liable for violating § 1983 upon a showing by the Plaintiffs that the alleged wrongdoer was executing an unconstitutional policy or custom *of the Trust itself*. Plaintiffs cannot establish that any policy belonging to the Trust caused any violation of their constitutional rights. Furthermore, former Executive Director Rod Bottoms' policies were constitutional. Even if Bottom's policies could be attributed to the

Trust, the policies did not cause a violation of Plaintiffs' constitutional rights. Plaintiffs may not maintain a claim for punitive damages against the Trust, and their claim for such damages is inappropriate. Plaintiffs failed to initiate their cause of action within the one-year period set forth in Okla. Stat. tit. 12, § 95(11), and, therefore, Plaintiffs' claims are time-barred.  The claims asserted by Plaintiffs Ashley, Foote, and Proctor must be dismissed pursuant to 42 U.S.C. § 1997e on the grounds that these Plaintiffs failed to exhaust their available administrative remedies prior to filing suit.

For these reasons, the Court should grant summary judgment in favor of the Trust in accordance with Rule 56(c) of the Federal Rules of Civil Procedure.

Respectfully submitted,

s/ John L. Blodgett
Chris J. Collins, OBA #1800
John L. Blodgett, OBA #18343
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th, Second Floor
Oklahoma City, OK  73105-1815
Telephone:  405-524-2070
Facsimile:   405-524-2078
E-Mail:        cjc@czwglaw.com
                   john@czwglaw.com

Attorneys for Defendant Pottawatomie
County Public Safety Center Trust

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2009, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Cregg Webb and William Roberson.

s/ John L. Blodgett
John L. Blodgett
