# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

STEPHEN PROCTOR, ROBERT ALMON,  )
TRAVIS FOOTE, MATTHEW LANEY,     )
TECUMSEH MARTINEZ, BOBBY          )
ASHLEY, AMANDA ELLETTE, LLOYD    )
CONOVER, and KENNETH REINHART,   )
                                 )
           Plaintiffs,        )          Case No. CIV-07-654-M
vs.                              )
BOARD OF COUNTY COMMISSIONERS    )
OF THE COUNT OF POTTAWATOMIE,    )
POTTAWATOMIE COUNTY PUBLIC       )
SAFETY CENTER TRUST, and ROD     )
BOTTOMS , individually and as Director of )
the Pottawatomie County Public Safety )
Center Trust,                    )
                                 )
           Defendants.        )

**SUPPLEMENT TO PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF POTTAWATOMIE.**

# EXHIBITS
## PART I

Cregg Webb, OBA #17366
Haselwood & Webb, P.C.
400 North Broadway
Shawnee, OK 74801
Telephone: (405) 273-2332
Facsimile: (405) 273-2334

Bill Roberson, OBA #7626
320 North Broadway
Shawnee, OK 74801
March 27, 2009          Telephone: (405) 273-0240
Facsimile: (405) 395-9520

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT 1

# Procedures for Use of Restraint Chair

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**PROCTOR v. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF
POTTAWATOMIE, CASE NO. CIV-07-654-M**

## Procedures for Use of the Restraint Chair

A.  Procedures to be followed in the application of the restraint chair are:

1.  The camera operator will videotape the inmate throughout the entire process of use of the restraint chair.  Care will be taken to protect the safety of the camera operator.

2.  Whenever possible, all security-related applications of the restraint chair will be approved in advance by the warden/acting warden.  Health services staff will review the inmate's medical record for any medical condition that may affect the use of the restraint chair prior to its use.  Such medical condition will be documented in the medical/clinical record.

3.  When the use of the restraint chair is necessary for medical or psychological reasons, use will be approved in advance by the warden/acting warden and the chief medical officer, staff physician, or duty nurse, who will review the inmate's record for any medical condition that may affect the use of the restraint chair.  Such medical condition will be documented in the medical/clinical record.

4.  Use of the restraint chair will be only when an inmate is destroying state property, to prevent self-injury or injury to others, or for medical or psychological reasons.

5.  Placement of an inmate in the restraint chair will be accomplished by a use of force team, as specified in facility procedures.

6.  At least one of the following listed personnel will be present for the application of the restraint chair unless a life-threatening situation necessitates immediate action.  If the situation is life-threatening, the shift supervisor will determine the need for immediate action prior to the arrival of at least one of the following personnel:

    a.  Warden

    b.  Deputy Warden

    c.  Chief of Security

    d.  Duty Officer

B.  Application of the restraint chair will include the following progressive steps:

1.  A "Use of Force Special Instructions" (Attachment E) will be completed by the shift supervisor in charge, prior to any use of force.

DEFENDANT'S
EXHIBIT
9

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
25

2.      The shift supervisor will give the inmate a direct to order to submit to handcuffs, before placement in the restraint chair.

3.      Specific steps to be followed for placement in the restraint chair are:

      a.      Inmates should only be clothed in their shirt and pants. Ensure that all of the inmate's personal property has been removed, to include ring, glasses, shoes, boots, socks, coat, hat, and belt. **The inmate should be handcuffed and wearing leg irons when warranted.**

      b.      Have the inmate sit in the seat, secure the lap belt free end in the lap belt clevis, and pull the handle until snug. To loosen the lap belt, insert a standard handcuff key in the lap belt buckle, and push in while pulling slack on the lap belt.

      c.      Place the chain of the leg irons behind the chain retainer and attach the handcuff tether to the handcuffs.

      d.      Release the right wrist from the handcuffs and secure it to the arm of the restraint chair with the left wrist and pull the belt snug. **Do not cut off circulation to the hand.**

      e.      Release the left wrist from the handcuffs and secure it to the arm of the restraint chair with the left wrist and pull the belt snug. To loosen wrist strap, press in on the wrist strap buckle while pulling slack on the wrist strap. **Do not cut off circulation to the hand.**

      f.      Retighten the lap belt, if necessary.

      g.      Fasten the shoulder strap by passing the free ends over the shoulders, under the armpits, and securing them to the shoulder strap clevises located on the back of the chair. Then tighten by pulling down on the shoulder strap handle. **Do not wrap the straps around the <u>chest, head, or neck.</u>**

      h.      Secure the ankle strap by passing the free end around the front of the ankle and securing it to the ankle strap clevis. Then pull the ankle strap handle until snug.

      i.      Remove leg irons.

      j.      Violent behavior may mask dangerous medical conditions. Inmates must be monitored continuously and provided medical treatment, if needed. **Belts and straps may need to be loosened to ensure adequate blood flow. Inmates will not be left in the restraint chair for more than two hours at a time.**

C.  After placement in the restraint chair, medical staff will examine the inmate to ascertain if restraints are too tight and to check for injuries incurred during the restraining application.  If not previously determined, medical staff will review the inmate's medical record immediately after the initial assessment is complete to identify any pre-existing medical condition that might affect the use of such restraints.  Such medical condition will be documented in the medical/clinical record.

   1.  All officers involved in any use of force will be examined by medical staff for any injuries.

   2.  The restrained inmates will be checked every 15 minutes, to include a circulation check, by the SHU officer/medical staff, who will immediately report any unusual medical problems to health services staff.  These checks will be documented in the SHU custody log or unit activity log.

D.  The inmate will not be left in the restraint chair longer than two hours.  A determination will be made at two hours on whether the inmate's behavior dictates further restraint.  Any period of restraint in excess of two hours will require review and determination by the warden and the health services administrator or the highest-ranking medical officer on duty.  If further restraint is necessary, a determination will be made on the type of restraints that will be used, e.g. walking restraints, four point restraints, five point restraints.  All continued use of restraints must be documented in the SHU custody log or unit activity log.

E.  All relevant information concerning the restrained inmates will be entered in the SHU custody log or the unit activity log.  Every event, both verbal and physical, will be considered relevant and entered in the log.  Each log entry will contain the date, time, details of the event, or visit from an official, and initials of the reporting officer.

(R 02/03)

# WARNING

Use of the Emergency Restraint Chair without first reading and thoroughly understanding the instructions could cause injury or death.





PLAINTIFF'S
EXHIBIT

SS

DEFENDANT'S
EXHIBIT

10

# EXHIBIT 2

# Reinhart Depo.

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**PROCTOR v. BOARD OF COUNTY COMMISSIONERS OF THE
COUNTY OF POTTAWATOMIE, CASE NO. CIV-07-654-M**

**COPY**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

STEPHEN PROCTOR,
ROBERT ALMON,
TRAVIS FOOTE,
MATTHEW LANEY,
TECUMSEH MARTINEZ,
BOBBY ASHLEY,
AMANDA ELLETTE,
LLOYD CONOVER,
and KENNETH REINHART,

        Plaintiffs,

Vs.                                     Case No. CIV-07654M

BOARD OF COUNTY COMMISSIONERS
of the COUNTY OF POTTAWATOMIE
and the POTTAWATOMIE COUNTY
PUBLIC SAFETY CENTER TRUST;
and ROD BOTTOMS, Individually,
as the Director of
POTTAWATOMIE COUNTY PUBLIC
SAFETY CENTER TRUST.

        Defendants.



### DEPOSITION OF KENNETH REINHART
TAKEN ON BEHALF OF THE DEFENDANTS
ON NOVEMBER 13, 2008, BEGINNING AT 10:39 A.M.
IN MCALESTER, OKLAHOMA

REPORTED BY:  Daniel Luke Epps, CSR, RPR

PROFESSIONAL REPORTERS

TULSA, OK
918.583.8600  405.272.0559 FAX

OKLAHOMA CITY, OK
405.272.1006  405.272.0559 FAX

FAYETTEVILLE, AR
479.587.1006  866.603.0559 FAX

CORPORATE OFFICE   511 Couch Drive, Suite 100   Oklahoma City, OK 73102

TOLL FREE **800.376.1006**

www.**PROREPORTERS**.com

1    Q    Did she ask you questions concerning
2  the escape?

3    A    Yeah.

4    Q    Did she ask you anything else?

5    A    I don't remember specific questions,
6  but it was all mainly the escape and why did I do
7  it.

8    Q    Were you in the restraint chair at
9  the time that those questions were asked?

10   A    Yes.

11   Q    Were you wearing that suicide gown
12  at the same time?

13   A    Yes.

14   Q    Tell me about the restraint chair
15  that you were placed in.

16   A    It's a black plastic chair that has
17  harnesses and straps and cinches and immobilizes
18  you.

19   Q    What on your body was restrained in
20  the restraint chair?

21   A    Your torso, your head, your arms,
22  and your legs.

23   Q    How is your head restrained?

24   A    They put a strap across there and
25  they cinch it tight.



PROFESSIONAL REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

71

1    Q      And how is your torso restrained?

2    A      They have like a harness type thing

3 that they strap down and pull tight.

4    Q      Does it go over your shoulders?

5    A      Over your shoulders and then it

6 splits and goes two ways around your body.

7    Q      So it both goes around your stomach

8 and over your shoulders then?

9    A      Yeah.

10    Q      And then you said your legs, too?

11    A      Your legs are strapped at the thighs

12 and at the ankles.

13    Q      And what about your arms?

14    A      They're strapped at the wrists.

15 You're not going to move.

16    Q      Had you ever been in a restraint

17 device like that before this conversation with

18 the internal affairs officer?

19    A      No, no.

20    Q      That was your first time?

21    A      (Witness nods head.)

22    Q      Is that yes?

23    A      Yes.

24    Q      And you said you were -- you made

25 the comment you are not going to move.  I take it

**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    you were not able to move at all in that chair?

2           A      You can't even shake your head or

3    move your head up and down.

4           Q      Do you recall how long it was that

5    you spoke with the internal affairs officer?

6           A      No.

7           Q      All right.  This document says

8    Internal Affairs Frair talked to Inmate Reinhart

9    for about ten minutes.  Do you have any

10   disagreement with that time period?

11          A      No.

12          Q      All right.  This document continues

13   here and states, "Inmate Reinhart was wheeled

14   over to the rubber room.  Inmate Reinhart was let

15   out of the restraint chair while Sergeant Gosey

16   and Corporal Osse stood with Tasers.  Officer

17   Hudlow took the restraints off of Inmate

18   Reinhart.  Inmate Reinhart was placed on a

19   fifteen minute watch.  The whole time the Tasers

20   were out they were pointed at the floor.  Not

21   once were the Tasers pointed at Inmate Reinhart."

22   That's what this document says, and by your

23   reaction, I take it you disagree with that?

24          A      Absolutely.

25          Q      Tell me why you disagree with that.

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1          A     I'm not sure.  I would guesstimate
2    an hour, maybe.                    .
3          Q     Did anyone ever tell you why you
4    were placed in the restraint chair?
5          A     No.
6          Q     Did anyone ever tell you why you
7    were being placed in the rubber room?
8          A     Per Commander Bottoms' orders.
9          Q     That's all you know is that Bottoms
10   said to put you in there?
11         A     Yeah.
12         Q     And then you said the 15 minute
13   thing was per Mr. Bottoms?
14         A     Yes.
15         Q     All right.
16         A     And it was a 15 minute verbal
17   response.
18         Q     Tell me about that.  What do you
19   mean when you -- you've said that a few times.  I
20   just want to make sure I'm understanding exactly
21   what it is you're talking about.
22         A     And I know this by being around in
23   the jails.  I'm, you know, savvy.  On a normal
24   suicide watch, they go to the window, they'd see
25   that you're breathing.  If they can't tell if



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    you're breathing, they'll knock, hey, and the

2    person will wave.                .

3        Q    Okay.

4        A    That wasn't good enough per Rod

5    Bottoms.  I was to sit up and tell them, "I'm

6    alive," or, "Okay," or give a verbal response

7    thus keeping me awake for 48 hours.

8        Q    Now, how do you know that

9    Mr. Bottoms said to give the verbal -- wanted you

10   to give the verbal response?

11       A    Because everybody said it, all of

12   the sergeants and lieutenants said.  I said,

13   "Hey, why do you guys keep waking me up?"  I

14   asked day after day.  "Per Mr. Bottoms you're to

15   give a verbal response."

16       Q    How long did you stay in the rubber

17   room?

18       A    I believe it was two days.  Excuse

19   me.

20       Q    After you were released from the

21   rubber room, where did you go from there?

22       A    I was chained to a bed in a cell.

23       Q    Were you returned to a pod?

24       A    Yes.

25       Q    Do you recall what pod you were


PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ——————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

77

1    bed has a lip coming up, you know, kind of makes

2    a little boat.  It's about this high maybe.  They

3    went in and drilled a hole in that, put a padlock

4    through it, put the chain on, chained it, put the

5    chain around my ankle, and padlocked it.

6            Q      What type of chain was it?

7            A      A normal chain.

8            Q      Like with links?

9            A      Yeah.

10           Q      Not like a rope style chain, but a

11   chain link?

12           A      No.  Something you'd tow a car with.

13           Q      Okay.  How heavy of a chain was it?

14           A      Pretty good gauge chain.  I mean, I

15   would tow my car with it.  I would tie down a

16   load on a semi with it.

17           Q      And they secured one end of the

18   chain to the bunk, is that right, with a padlock?

19           A      They drilled a hole in the bunk and

20   padlocked it.

21           Q      All right.  Then how long was the

22   chain total length from end to end?

23           A      I don't know how long it was.  I

24   could tell you that with my leg chained to the

25   bed, I could not get all the way to the stool to

**PROFESSIONAL**
**REPORTERS**
Experience and service that sets the standard

PR#14515          REINHART, KENNETH          11/13/2008

1   use the bathroom.  I had to kind of improvise.

2          Q      Okay.  Which leg did they affix the

3   chain to your body on?

4          A      The leg I had surgery on.

5          Q      On your right leg?

6          A      Yes.

7          Q      And how did they affix the chain to

8   your leg?

9          A      They wrapped the chain around my

10  ankle and padlocked it.

11         Q      Using a padlock similar to what they

12  had used to chain the chain to the bunk?

13         A      Correct.

14         Q      Was it long enough chain that you

15  could stand up beside the bunk?

16         A      Yes.

17         Q      Was it long enough chain that you

18  could take a step away from the bunk with the

19  chain -- with the leg that was chained?

20         A      One step.

21         Q      How far away from the bunk was the

22  toilet?

23         A      About three steps.

24         Q      So you said you had to improvise?

25         A      Uh-huh.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ————————————918-583-8600

FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1        **Q**    I take that to mean you had to do a

2    -lot of aiming when you used the restroom?

3        **A**    Yeah, and when I wanted --

4        **Q**    I understand.  Number two we'll say

5    for lack of a better word.

6        **A**    In one of the Styrofoam containers

7    they gave me my food in.

8        **Q**    Did anybody -- did you ever ask for

9    anybody to come let you out so that you could use

10   the restroom?

11       **A**    Yes.

12       **Q**    All right.  Tell me, I don't know

13   what these cells are like.  What is inside one of

14   these cells in this pod that you were housed in?

15       **A**    Okay.  If you're walking into a

16   cell, the door opens.  On the back wall is the

17   bunk.

18       **Q**    All right.

19       **A**    Just inside the door on the

20   right-hand side is the toilet and sink.

21       **Q**    Okay.

22       **A**    On the left-hand side up next to the

23   bunk is a desk and that's it.

24       **Q**    Just one bunk in this particular

25   cell?

**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1      Q      Not even to use the restroom?

2      A      No.  I wrote them grievances saying

3  let me have some toilet paper, something to wipe

4  my hands with, wash my hands, you know, after

5  using the restroom, you know.  I'm eating with my

6  -- you're making me eat with my fingers, and

7  they'd say, "We'll look into it," or, "You knew

8  your consequences when you did this," and just

9  smart ass stuff.  They didn't care.

10     Q      What did you eat while you were

11 chained like this?  Actually let me stop you

12 before you even start to answer that question.

13 Prior to being chained up, when you were in the

14 max pod, how did you feed in the max pod?  How

15 would you get served food?

16     A      They would let one cell out at a

17 time, you'd go out and get your food, your drink,

18 and take it in, and, you know, you get a spoon or

19 whatever, a spork, and you'd go in and eat and

20 they'd collect the trays later.

21     Q      Okay.  One cell out at a time you'd

22 go over to the main door into the pod and accept

23 your tray?

24     A      Yes, yes.

25     Q      And then you were to take it back to



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    your cell?

2         A     Sometimes -- well, no.  At that time

3    you were allowed to eat outside if you wanted to

4    or you could go back to your cell.

5         Q     Okay.

6         A     I generally chose to go back to my

7    cell because I'm just -- don't like being around

8    people.

9         Q     Okay.  Now, when you were

10   restrained, how did feed occur when you were

11   restrained?

12        A     They brought it into the cell to me.

13        Q     All right.  What was -- was it the

14   same?  Was it a tray that they brought to you?

15        A     Styrofoam tray with a lid, you know.

16        Q     Okay.  That's what it was while you

17   were restrained as well?

18        A     Yeah.

19        Q     Any different food?  You said you

20   had to eat with your fingers?

21        A     A lot of carrots and celery, you

22   know, vegetables to eat with and maybe a

23   sandwich, you know.

24        Q     Nothing that you would need a knife

25   to cut with or a fork to cut with?


PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    A    Well, yeah.  If they gave you

2    something, you know, like spaghetti or something,

3    ask for, you know, a spoon to eat it with, no,

4    you're on finger food, but most of the time it

5    was, you know, during the day sandwiches and

6    stuff like that.  Breakfast they'd give you

7    oatmeal and stuff and tell you just deal with it.

8        Q    Did you ever receive food during

9    that two-week time that you were chained to your

10   bunk that was just your dinner blended up in a

11   blender and put in a Styrofoam cup?

12       A    No.

13       Q    Did you ever see food ever during

14   your time in Pottawatomie County like that?

15       A    I don't remember.  I don't remember.

16   I can't say.  I thought Matt Laney was getting it

17   like that for a while, but I don't remember.

18       Q    Okay.  Do you have the incident

19   reports there?

20       A    Yes.

21       Q    I need you to flip forward a couple

22   pages to an incident number 618 which is from

23   July 22, 2005.  I think they're in chronological

24   order there in that exhibit.

25            MR. ROBERSON:  There is a 618.


**PROFESSIONAL
REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ————405-272-1006
TULSA ————————918-583-8600
FAYETTEVILLE ————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1              MR. BLODGETT:  618, yes.

2              MR. ROBERSON:  Okay.

3         Q    (BY MR. BLODGETT)  I want to ask him

4    a few questions about 618 here.  Mr. Reinhart,

5    I'm going to ask you a few questions about

6    incident number 618, which is one of the incident

7    reports in this Exhibit 5.  That incident report

8    is dated July 22, 2005.  I think you've had a

9    chance to read over this before.  This incident

10   report contains some incidents where you were

11   having -- it alleges some issues you were having

12   with an Officer Barrett.  Do you recall having

13   words with an Officer Barrett?

14        A    Not specifically, but...

15        Q    Okay.  It describes an incident

16   where you had called asking for a shower.  Do you

17   recall anything about that?

18        A    No, but I'm not going to say it

19   didn't happen.

20        Q    Do you recall an incident where you

21   became upset and began pushing the intercom

22   repeatedly?

23        A    Yeah.

24        Q    Tell me what happened that you

25   pressed the intercom -- why did you do that?

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1      A      Because she was ignoring me.

2      Q      Who was ignoring you?

3      A      Whoever was on the other end of the

4 intercom.

5      Q      What were you requesting that she

6 was ignoring?

7      A      I believe a shower.

8      Q      All right.  And what was the

9 response you were looking for?

10      A      For her to let me out for a shower.

11      Q      Was there a shower in your pod?

12      A      Yes.

13      Q      So you wanted to be let out of your

14 cell so that you could take a shower, is that

15 right?

16      A      Yeah.

17      Q      Okay.

18      A      Which was normal procedure.

19      Q      This incident report states in the

20 second to last sentence here, "At approximately

21 1100 hours, Inmate Reinhart was placed in the

22 restraint chair by Sergeant Goodwill, Officer

23 Terry, and Sergeant Goodwill."  I don't know if

24 there's two different Goodwills or if he just

25 repeated the same one twice.  Do you recall being



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    placed into the restraint chair because of the

2    incident with the intercom system?

3            A      I recall being placed in the

4    restraint chair, yeah.

5            Q      You don't remember them telling you

6    that it was for repeated pressing the intercom

7    button?

8            A      It was at the same time.  They never

9    told me why.

10           Q      Okay.

11           A      But I wouldn't say, no, that wasn't

12   the reason why.

13           Q      This would then be the second time

14   that you were placed in the restraint chair, is

15   that correct?

16           A      Correct.

17           Q      Tell me, if you would, how it was

18   that you were placed in the restraint chair this

19   time?  Did they bring the restraint chair to the

20   pod?

21           A      Yeah.  Held a Taser on me and told

22   me to sit in the chair.

23           Q      Who held the Taser on you on this

24   occasion?

25           A      I think it was Goodwill's wife.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    There's two Goodwills.

2        Q      Okay.  So there were two Goodwills

3    then?

4        A      Yeah.

5        Q      Okay.  And you thought it was

6    Mrs. Goodwill that held the Taser on you?

7        A      I believe, yeah.

8        Q      Now, did she ever use a Taser on you

9    on this occasion?  I mean, did she fire the

10   Taser?  Did she shoot you with the Taser?

11       A      Not at that point, no.

12       Q      Okay.  The incident report, number

13   618 from July 22, 2005, continues, "He was placed

14   in the west recreation area."

15       A      Yes.

16       Q      Do you recall that?

17       A      Yes.

18       Q      Now, when you were placed into the

19   restraint chair, I think you just said a moment

20   ago they brought the restraint chair to the pod,

21   is that right?

22       A      Yes.

23       Q      They told you to sit in the chair

24   there in the pod?

25       A      They restrained me.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1        Q       They strapped you in there in the

2    pod, is that right?

3        A       Correct.

4        Q       Then they wheel you out of there --

5        A       Correct.

6        Q       -- to this west recreation area?

7        A       Correct.

8        Q       Tell me what that area is.

9        A       It's just a big, open area that they

10   have put a basketball hoop in and called it the

11   rec yard.

12       Q       Were there people who could see you

13   in that area?

14       A       Everyone.  People in the pods,

15   whoever.

16       Q       The document concludes with -- it

17   previously said, "He was placed in the west

18   recreation area on 15 minute site checks for 72

19   hours and on finger foods."

20       A       Uh-huh.

21       Q       Do you recall being restrained for

22   72 hours at that point in time?

23       A       Yeah.  That's when they Tasered me.

24       Q       Tell me about that.

25       A       I told them it was against the law



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

PR#14515          REINHART, KENNETH          11/13/2008

1    for them to keep me in that chair.  This was, I

2    think, the second day.  I said, "It's against the

3    law for you to keep me in this chair like that

4    and I want out.  Read the chair.  It says don't

5    keep me in here for more than two hours right on

6    the chair."  They said, "We don't want to hear

7    it," so I started screaming about it, you know,

8    and you've got to understand they've got a

9    plastic bag or a net bag over my head thinking

10   I'm going to spit on them.  I've never spit on

11   anybody in my life, you know, and I'm screaming

12   and they come in there, and they've got a Taser

13   gun and, "You need to shut up."  Shutting up,

14   "You need to get me out of this chair," back and

15   forth, back and forth.  "I'm giving you a direct

16   order.  Stop screaming," and I said, "I don't

17   care about your direct order.  I'm giving you a

18   direct order.  Get me out of this chair."  "If

19   you don't stop screaming, I'm going to Taser

20   you."  "You can just do what you've got to do.

21   Get me out," and pow.  They Tasered me.

22           Q     Do you know who it was that Tasered

23   you?

24           A     A black officer.  I don't know what

25   his name is.

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————— 405-272-1006
TULSA ————————— 918-583-8600
FAYETTEVILLE ————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

PR#14515        REINHART, KENNETH        11/13/2008

93

1        **Q**        If I said his name was Manson, does
2    that sound familiar?

3        **A**        Manson, Munson.  I think that might
4    -- I think that might be who it was, yeah.

5        **Q**        You're sure it was an
6    African-American officer, though?

7        **A**        Boy, I know he's there.  I'm not
8    going to pinpoint it on him because I know he was
9    back there where the Taser was.  I thought he had
10   the Taser.  It might have been the -- I don't
11   know what they called him, the lieutenant or
12   whoever.

13       **Q**        When was the spit mask put on you?

14       **A**        The first day.

15       **Q**        Was that put on you in the pod or
16   was that put on you when they moved you to the --

17       **A**        When I got there.

18       **Q**        -- to the recreation area?

19       **A**        Yeah.

20       **Q**        I don't know what that is.  Can you
21   describe?

22       **A**        It's a net bag that, you know, you
23   can see through it.  It's small mesh that's got a
24   little cinch that they -- they don't choke you
25   out with it or nothing, but they get it to where



**PROFESSIONAL
REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1    it can't come off your head, you know, and they

2    leave it there.

3        Q    Now, you testified earlier that when

4    you were restrained to the chair, they put a

5    restraint on your head and actually held your

6    head in place.

7        A    Uh-huh.

8        Q    Did you have the bag put over your

9    head?

10       A    The bag, then the restraint.

11       Q    Okay.  So the bag went on your head

12   first, and then your forehead was cinched up in

13   the chair?

14       A    Yeah.

15       Q    Okay.  Where on your body were you

16   Tased when you were Tased that day?

17       A    One hit me here and one hit me in

18   the leg.

19       Q    One in the mid stomach area, middle

20   of your torso area?

21       A    Yeah, and one in the leg.

22       Q    In your left leg?

23       A    Uh-huh.

24       Q    Do you have any idea how long they

25   Tased you?



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY —————— 405-272-1006
TULSA ————————— 918-583-8600
FAYETTEVILLE ————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1      **A**      No.   When that Taser hits you, you

2  lose all -- it seemed like an hour.   It really

3  did.   I mean, it seemed like it went on forever,

4  and you can't move.   You can't jerk and shake.

5  You're restrained, you know.

6      **Q**      Now, this document, this part of

7  Exhibit Number 5, incident number 618 says that,

8  "At approximately 1100 hours, you were placed in

9  the restraint chair."   That's approximately 11:00

10  a.m.

11      **A**      11:00 in the morning.

12      **Q**      Yes.   You're telling me that the

13  incident involving the Tasing occurred the

14  following day?

15      **A**      Yeah.

16      **Q**      How many times were you allowed out

17  of the restraint chair between the time they put

18  you in there and the time that you were Tased?

19      **A**      One time to go to the bathroom.

20      **Q**      And do you recall when that was?

21      **A**      It was at night, the graveyard

22  shift.   So it was at least 11 hours later, 12.

23      **Q**      What did you do for the remainder of

24  the time you were there in the chair?   Did you

25  just hold it the whole time?

**PROFESSIONAL
REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ———————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

1      A      No.  I ended up pissing on myself.

2      Q      How many times did that happen?

3      A      Three or four.

4      Q      Did they then let you out to change

5    or anything like that?

6      A      No, no, no.

7      Q      Just sat you in it the whole time?

8      A      (Witness nods head.)

9      Q      What were you wearing while you were

10   in the restraint chair this second occasion?

11     A      Orange jump -- orange inmate suit.

12   I've got to stand up a minute.  Go ahead.

13     Q      That's fine.  You can stand up if it

14   makes you feel more comfortable.  This document,

15   this Exhibit Number -- I'm sorry, Exhibit 5,

16   number 618, says that you were placed on 15

17   minute sight checks.  Do you recall people coming

18   in to check on you every 15 minutes?

19     A      No.  The satellite officer would

20   look in there and that was their check.

21     Q      They could see you then?

22     A      Yeah.  There's a big glass window

23   there.

24     Q      It also says you were on finger

25   foods.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ——————————918-583-8600

FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

98

1      A     No.

2      Q     So it's your testimony that from the

3  minute they put you in the restraint chair at

4  approximately 11:00 a.m. --

5      A     I was let up one time in 72 hours.

6      Q     Did you receive three meals a day

7  while you were in that restraint chair?

8      A     I was offered three meals a day,

9  yes.

10     Q     Did you accept three meals a day?

11     A     No.

12     Q     Is there any reason why you didn't

13  accept three meals a day?

14     A     Number one, I didn't want to have to

15  use the bathroom on myself, you know.

16     Q     What about water?  Did you ever

17  receive any water?

18     A     They would come around about every

19  four or five hours with a Styrofoam cup and ask

20  me if I wanted water, and they'd undo the plastic

21  netting, lift it up, and let me drink a little

22  bit.

23     Q     Did you receive any treatment for

24  your leg while you were in the restraint chair?

25     A     Yes.



PROFESSIONAL REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————405-272-1006
TULSA ————————918-583-8600
FAYETTEVILLE ————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

99

1      **Q**    The nurse came and --

2      **A**    Yeah.

3      **Q**    -- checked on your leg?

4      **A**    Changed the dressing, and she would

5  the whole time say, "I can't believe they're

6  doing this," you know.

7      **Q**    The nurse said that to you?

8      **A**    Yeah.

9      **Q**    Do you recall which nurse that was?

10     **A**    Tammy.  I'd like to expound.  I know

11  from observation that normally when somebody goes

12  in the chair, they let them up for 15 minutes

13  every four hours to walk around, get some

14  circulation going, use the restroom.  They didn't

15  do that with me.

16     **Q**    You knew that from what?

17     **A**    From observation of other people

18  being placed in the chair.

19     **Q**    At the Pottawatomie County you mean?

20     **A**    Yeah.

21     **Q**    Okay.

22     **A**    I mean, you can see it from every

23  pod in the cluster, you know.  You can see right

24  into the gym area, the big glass windows, you

25  know.  It's set up in a circle like this, and the

**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

100

1   gym is here and all these pods can see in, you

2   know.

3           Q       You said earlier that there was

4   something on the chair that said only two hours,

5   only use it for two hours?

6           A       Yeah.

7           Q       Was it a sticker?

8           A       A manufacturer's sticker.

9           Q       Where was it located?

10          A       On the handle where they push you

11  from.

12          Q       On the back of the --

13          A       Yeah, caution, can cause death, you

14  know, blah-blah-blah.

15          Q       Okay.  And it said only two hours is

16  all it said?

17          A       It said no longer than two hours.  I

18  believe it's something -- two hours something --

19  I mean, I've read it, but I don't remember

20  verbatim.

21          Q       Did you see it on the chair?

22          A       Yes.

23          Q       It was on the chair then when you

24  were placed in the chair?

25          A       Yes.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————405-272-1006
TULSA ————————918-583-8600
FAYETTEVILLE ————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559